UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal Case No. 16–96 (RBW) |
| SHARAFAT ALI KHAN, | ) ) | |
| Defendant. | ) ) | |

# MEMORANDUM OPINION

On April 12, 2017, the defendant in this criminal matter pleaded guilty to Conspiracy to Defraud the United States and Conspiracy to Encourage and Induce Unauthorized Aliens to Come to the United states for Commercial Advantage and Private Financial Gain, in violation of 18 U.S.C. § 371. See Plea Agreement (Apr. 10, 2017) at 1, ECF No. 29. The defendant is now pending sentencing, and the parties have submitted memoranda in aid of sentencing, drawing into question the sentencing range applicable to the defendant under the United States Sentencing Guidelines (the "Guidelines"). See generally Government's Memorandum in Aid of Sentencing ("Gov't's Mem."); Defendant Khan's Memorandum in Aid of Sentencing and Motion for Downward Departure ("Def.'s Mem."). Specifically, the parties disagree as to the propriety of imposing a sentencing enhancement for the defendant's purported aggravated role as an organizer or leader in the conspiracy to which he pleaded guilty. See Gov't's Mem. at 10–16; Def.'s Mem. at 7–8. Upon careful consideration of the parties' submissions and the oral arguments made during the sentencing hearings held in this case,[1] the Court concludes that the

---

[1] On July 25, 2017, and July 26, 2017, the Court held two sentencing hearings, during which the parties, among other things, advocated their positions with respect to this question before the Court. At the conclusion of these two hearings, the Court took the issue under advisement and indicated that it would issue a written opinion addressing the issues.

Guidelines enhancement for playing an aggravated role in the conspiracy is warranted in this case.[2]

## I. BACKGROUND

### A. Factual Background

The following factual allegations are taken from the Statement of Offense submitted by the government in conjunction with the defendant's guilty plea, which the defendant acknowledged is accurate. Statement of Offense (Apr. 6, 2017) at 1, ECF No. 28.

The defendant "is a Pakistani national who, at all relevant times was living in Brasilia, Brazil as a permanent legal resident." Id. ¶ 1. "From on or about March 2014 through on or about May 2016, [the] defendant . . . knowingly conspired with others (a) to defraud the United States, and (b) to . . . encourage and induce aliens to enter and reside in the United States for [his] private financial gain." Id. ¶ 2. As part of the conspiracy, the defendant "facilitated the travel of between [twenty-five] and [ninety-nine] different aliens for illegal entry into the United States," id. ¶ 3, as these aliens "had not received prior official authorization to come to, enter, and reside in the United States," id. ¶ 2. As part of his smuggling activities, the defendant "arrange[d] for the aliens to travel by land, air[,] or sea through Venezuela, Peru, Ecuador, Colombia, Panama, Costa Rica, Nicaragua, Honduras, El Salvador, Guatemala, Mexico, and eventually into the United States through various border points in Mexico." Id. ¶ 4. He also communicated and met with the aliens and arranged for their transport and stay at safe houses during their transit towards the United States. See id. ¶ 5. And, the defendant "arrang[ed] for various smuggling associates to serve as escorts for the same purposes during different legs of

---

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Presentence Investigation Report and (2) the government's Statement of Offense, which the defendant signed acknowledging its accuracy.

the smuggling route." Id.  The defendant also

> was responsible for managing the movement of these aliens through various countries via a network of individuals and transportation facilities who worked with [him] in getting [the] aliens from Pakistan (and other countries) to Brazil, through South and Central America, into Mexico, and through the Mexican border into the United States.

Id. ¶ 8.

In exchange for his smuggling services, the "[a]liens paid [the] defendant . . . and [his] co[-]conspirators various amounts—from around $3,000 USD to up to $15,000 USD—to travel from Pakistan to Brazil, through South and Central America, and eventually into the United States." Id. ¶ 6.  The defendant received "a variable percentage of the total smuggling fee paid as profit." Id.

## B. The Government's Evidence Presented at the Sentencing Hearing

During the sentencing hearing held on July 25, 2017, the government presented the testimony of Special Agent Michael Stempinski, who is currently employed at the United States Department of Homeland Security and is assigned to the Dulles Airport Investigative Group. See July 25, 2017 Trial Transcript ("Tr.") 8:17–24.  Stempinski was one of the agents who assisted in the investigation conducted in this case, and in particular, he "assisted the New York agents with [the defendant's] arrest when he arrived and was extradited to the United States through Dulles Airport." Id. at 12:10–21.  Stempinski based his testimony on his "general[] familiar[ity] with the facts and the evidence that was collected in this case[,] . . . [the] information conveyed to [him] by the other agents that worked on the case[,] . . . [and his] review of reports about interviews conducted in this investigation." Id. at 12–13.  In preparation for his testimony, Stempinski primarily focused on reviewing evidence specific to the defendant's role in the smuggling conspiracy, see id. at 14:1–5, and mainly testified about three interviews of

unauthorized aliens who the defendant assisted in their efforts to illegally enter the United States. These interviews were conducted by other law enforcement personnel, and Stempinski was not present during the interviews.  See id. at 12–13.

First, Stempinski testified regarding "the interview of an individual with the initials of MA," who is "an Afghani national that contracted with an individual in Afghanistan to be smuggled to the United States." Id. at 14:13–20.  According to Stempinski's review of MA's interview report, after MA arrived in Dubai, MA "contacted [the defendant] to arrange being smuggled to the United States." Id. at 23–24.  The defendant provided MA with directions regarding MA's travel to Brazil, and upon MA's arrival in Brazil, the defendant's "associate . . . picked [MA] up . . . and [took him] to [the defendant's] house [where h]e remained . . . for approximately four to five months." Id. at 14:25–15:4.  MA stated that this associate "indicated [to MA] that [the defendant] was his boss." Id. at 16:20–22.  MA also noted that "there were approximately [fifty] . . . people [who were also being smuggled who] would come and go" over the period of time that he was at the defendant's house, id. at 17:3–6, and that the defendant had two individuals at the house who "acted as [the defendant's] subordinates," id. at 17:17–18:2.  These two individuals were "responsible for feeding the aliens and paying for the electricity bills." Id. at 15:5–8.  MA recalled that the defendant "would periodically come to [the] house . . . to check on . . . the individuals he was assisting[,] . . . pick up utility and electric bills for the house[,] and would collect money from the employees of the house." Id. at 17:7–14.

MA further stated that the defendant "facilitated his travels through South and Central America and Mexico up to the United States" after leaving the house in Brazil. Id. at 15:8–10.  The defendant communicated with MA "using the WhatsApp text app[3] to provide direction and

---

[3] WhatsApp is an application that can be downloaded from the Internet and "is free and offers simple, secure,
(continued . . .)

guidance along the way." Id. at 15:11–13. As part of these communications, the defendant identified "other individuals that would assist MA . . . as [he] made [his] way transiting through other countries towards the United States," often referring to these individuals "as his man or his guys." Id. at 18:12–17. Additionally, throughout his journey to the United States, MA "was required to pay additional sums of money," id. at 15:13–14, either "through a cashier or . . . a Hawala system," id. at 19:2–3, which is

> an informal banking system that's sort of structured around friends and family . . . who will deposit an amount of money on one end in good faith, and on another end[,] somebody else will take out [the] money and pay it to the person that's entitled to receive that money,

id. at 19:7–11. "Upon arrival in Mexico," MA was instructed "to surrender at the [United States] border," and thereafter when MA complied with that instruction, he identified the defendant "as his smuggler from Brazil to the United States." Id. at 15:16–23.

Second, Stempinski testified regarding "the interview of an individual with the initials of KR," id. at 22:2–3, who is "a Pakistani national," id. at 23:12. KR's "mother made arrangements with a smuggler in Pakistan" to have KR illegally enter the United States. Id. at 23:8–14. KR started the journey by flying to Sao Paulo, Brazil, where he approached a person "holding a sign that said 'Dr. Nakib'" and stated to that person, "I'm here for Dr. Nakib." Id. at 23:15–17. This individual "took a photo[graph] of [KR], and . . . put [KR] on a bus from Sao Paulo to Brasilia" where he met the defendant "who identified himself to KR as Dr. Nakib." Id. at 23:20–22.[4] The defendant then drove KR to his house, took "KR's smuggling fee [of] $10,000[,] . . . [and]

---

(. . . continued)
reliable messaging and calling [that is] available on [cellular] phones all over the world." https://www.whatsapp.com/about/.

[4] The defendant "admitted [to law enforcement] that [Dr. Nakib] was one of his aliases . . . that he used and was referred to along the way for smuggling purposes." Id. at 22:19–23:6.

5

indicated [to KR] that he was the person that was going to give him everything." Id. at 23:23–24:3.

KR mentioned that "[he] stayed at [the defendant's] house for . . . three to four months," and while at the house, "he identified one employee . . . that worked in a similar capacity [of] managing . . . the aliens[] in transit." Id. at 24:4–9. Once KR left the house, the defendant facilitated his travel "through South/Central America and Mexico." Id. at 24:10–11. The defendant also gave KR "instructions via WhatsApp and telephonic calls to not mention upon arrival in the [United States] who he used to get to the United States or anything about his journey." Id. at 24:10–14. And the defendant told KR that if any issues arose, KR was to tell "the other smugglers along the route[] to call Dr. Nakib." Id. at 24:15–21. KR noted that the defendant referenced these other smugglers who would be assisting him during his journey "as his guys or his men." Id. at 24:22–25:1; see also id. 25:14–17 ("[KR] was instructed that upon arrival in Venezuela[,] he would be met by one of [the defendant's] men, . . . and, in fact, when [KR] did arrive in Venezuela, he was approached by an individual that indicated [that] he was an associate of [the defendant].").

Lastly, Stempinski testified regarding "the interview of an individual with the initials of AB," id. at 26:21–23, who is also a "Pakistani national," id. at 27:9. In Pakistan, AB was assisted by "a smuggler named Abid Khan," and upon arriving in Sao Paulo, he "stayed as an associate of [the defendant's] house awaiting further travel." Id. at 27:10–12. AB "paid an additional . . . $6,000 for [the defendant] . . . to smuggle him from Brazil to the United States[, a]nd that money was paid through his cousin in Pakistan to Abid Khan, [who] provided that money to [the defendant]." Id. at 27:12–16.[5] The defendant ultimately facilitated AB's travel

---

[5] The defendant "has admitted [that Abid Khan] was one of the associates he worked with in the smuggling network." Id. at 28:2–6.

6

"through South/Central America to Mexico," and AB noted that "there were smugglers in various areas that worked for [the defendant] that facilitated his travel up through to the United States," whereupon he was able to enter the United States "illegally." Id. at 27:17–28:1.

Stempinski also testified about "some of the key aspects of [the defendant's] smuggling activity based on the information [he has] reviewed." Id. at 29:2–4. He testified that "the bulk of the aliens identified in this case indicated" that the defendant "was their primary point of contact [while traveling] from Brazil to the United States." Id. at 29:6–9. The defendant "would often collect [and keep the aliens'] travel documents," and the aliens were unable "to effectively move from one stage of the route to the other without his assistance." Id. at 31:5–13. Some of the aliens "would pay [the defendant] in person. Some would pay through Hawala systems. Others were directed to deposit [the money] in [the defendant's] personal bank accounts, both in Brazil and Pakistan." Id. at 29:16–18. "In most instances[,] the [alien's] lump sum of money was paid to [the defendant], and [he] would then divvy out portions of it to his workers that were arranged further up along the route to facilitate [the alien's] journey." Id. at 20:10–13. The defendant "controlled the movement of the money to different smugglers or agents in different countries along these smuggling routes . . . [, and m]any times he would send them [the money] via Western Union." Id. at 32:10–16. In any event, according to Stempinski, the defendant received most of the money from the smuggling fees. See id. at 29:19–22; see also id. at 30:11–15 (noting that in his experience, aliens "will hire a main smuggler that's of the same nationality for the purpose of trust, language barriers, and assurances that they'll coordinate their movements effectively").

Stempinski also testified that the defendant managed the safe house in Brazil "where the[] aliens stayed while they were waiting to move to the next stage of the journey," even

though there were employees at the house. Id. at 29:24–30:4. The defendant chiefly relied on others to transport the unauthorized aliens from Brazil, and he had recruiters who worked for him to get additional clients. See id. at 31:22–32:3. And the defendant had other individuals who "assisted him with getting payments from [the] aliens." Id. at 32:4–9. Moreover, Stempinski testified about "admissions made by the defendant that go directly to his role in the [smuggling] organization." Id. at 32:20–21. The defendant

> admitted to smuggling people from Brazil to the United States[,] . . . [to] charging $5,000 to $6,000[,] . . . to sending Western Union payments to other smugglers along the route[,] . . . to communicating via telephone apps such as WhatsApp to the aliens . . . [and] to other agents that worked along the way to ensure safe passage of his clients[,] . . . and [to] send[ing] money . . . to his clients along the way to support minor expenses like food and other incidentals that weren't included in the smuggling fees.

Id. at 32:24–33:8. The defendant also identified "over ten" individuals who "were involved in the smuggling network." Id. at 33:18–21. Accordingly to Stempinski, information developed by investigators in the case "indicate[d that the defendant] was a large, if not the largest, smuggler of Pakistanis at the time," estimating that "[a]t least [eighty] and upwards of [one hundred]" aliens have "identified [the defendant] or have been suspected to have been moved by [the defendant] in this investigation." Id. at 35:20–25.

## II.     ANALYSIS

The parties disagree as to whether the defendant's offense level should be increased based on the role he played in the conspiracy. See Gov't's Mem. at 10; Def.'s Mem. at 8.[6] The government argues that the defendant's "activities exhibit nearly all of the characteristic traits of

---

[6] In its Presentence Investigation Report, the United States Probation Office (the "Probation Office") determined that the four-point enhancement for an organizer/leader role is applicable in this case. See Presentence Investigation Report ¶ 42 (June 28, 2017), ECF No. 36. The Probation Office reached this conclusion based on the evidence of the defendant's "coordination and connections in multiple countries other than Brazil, as well as his direction of activities and his customers' knowledge of [him]," indicated that the defendant was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Id.

8

an organizer or leader for the purposes of § 3B1.1(a) [of the Guidelines], obtaining the hierarchical standing and operational mastery to qualify for a 4-level role adjustment." Gov't's Mem. at 16. On the other hand, the defendant contends that "there are no facts . . . suggesting that [he] exercised control over any other co-conspirator in the scheme." Def.'s Mem. at 8.

According to the Guidelines, a defendant's offense level is increased by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). When evaluating the propriety of applying this enhancement to a defendant's offense level, the Court "should" consider the following factors:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Id. cmt. n.4; see also United States v. Graham, 162 F.3d 1180, 1185 n.5 (D.C. Cir. 1998) (these factors are relevant to whether any aggravated role enhancement applies). No single factor is dispositive. Graham, 162 F.3d at 1185. "At sentencing, it is the Government's burden to demonstrate by a fair preponderance of the evidence that [the] enhancement is warranted." United States v. Bapack, 129 F.3d 1320, 1324 (D.C. Cir. 1997) (discussing U.S.S.G. § 3B1.1(c)).

Aside from these factors, this Circuit has emphasized that there is a threshold requirement that "'the defendant must have been the organizer, leader, manager or supervisor of one or more participants' in the criminal activity," United States v. Vega, 826 F.3d 514, 538–39 (D.C. Cir. 2016) (quoting U.S.S.G. § 3B1.1 cmt. n.2), and "not simply the property or assets of the conspiracy . . . in order to warrant an aggravated role enhancement," United States v. Olejiya, 754 F.3d 986, 990 (D.C. Cir. 2014) (citing U.S.S.G. § 3B1.1 cmt. n.2). And as defined in the commentary to this Guideline, "[a] 'participant' is a person who is criminally responsible for the

9

commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. n.1 (emphasis added). Thus, for the enhancement to apply, there must be "proof that [the defendant] was hierarchically superior to [his] co-conspirators." United States v. Quigley, 373 F.3d 133, 140 (D.C. Cir. 2004) (emphasis added) ("All persons receiving an enhancement [under § 3B1.1] must exercise some control over others."); see also United States v. Clark, 747 F.3d 890, 896–97 (D.C. Cir. 2014) ("[W]e are convinced by the district court's discussion of [the defendant]'s cousin's criminal involvement that the court found that [the defendant] controlled at least one criminal participant.").

    Here, the Court finds that the government has established by a preponderance of the evidence that the four-level aggravated role enhancement is applicable to the defendant's offense level. To satisfy its threshold obligation and demonstrate that the defendant was an organizer or leader over other participants in the conspiracy, the government primarily relies on various individuals identified in the investigation of the conspiracy, of which the defendant admits he was a member. First, Stempinski testified that two of the unauthorized aliens identified at least one individual who worked for the defendant at the safe house where the unauthorized aliens remained while awaiting their travel from Brazil to the United States. See July 25, 2017 Trial Tr. 15:5–8. According to the unauthorized aliens, the employees at the safe house were primarily responsible for providing the unauthorized aliens with food and delivering the utility bills to the defendant. Id. at 17:7–14. Stempinski also testified that the unauthorized aliens told investigators that, upon their arrival to Brazil, individuals working for the defendant would transport them either to the defendant or to the defendant's house. Based on this evidence, the government has established that the defendant exercised a level of hierarchical control over other individuals as required by this Circuit to warrant the aggravated role enhancement. See Quigley,

373 F.3d at 140 ("We understand the concept of 'control' or 'authority,' implicit in the notion of 'management' or 'supervision,' to connote some sort of hierarchical relationship, in the sense that an employer is hierarchically superior to his employee.").

But, the government has not made a showing that these individuals who purportedly worked for the defendant were participants in the conspiracy, as contemplated by the Guidelines and this Circuit. In fact, the government does not allege that these individuals were participants in the conspiracy. See generally Gov't's Mem. at 15. And, more importantly, as the defendant notes, see July 25, 2017 Trial Tr. 40:11–21, the government does not provide any evidence that these individuals "had the requisite criminal mens rea and culpability to qualify as 'participants'" in the conspiracy, Vega, 826 F.3d at 539 (vacating the defendant's sentence and remanding the case to the district court for resentencing because the district court failed to make a finding on this issue, which is necessary for the enhancement to apply). Thus, the Court is left without any indication or any evidence to determine whether these individuals knowingly assisted in the criminal conspiracy. See Bapack, 129 F.3d at 1325 ("This does not mean, however, that to qualify as a 'participant' a person must be found criminally responsible as a principal or culpable in the same crime of which the supervising defendant was convicted: '[J]ust as a party who knowingly assists a criminal enterprise is criminally responsible under principles of accessory liability, a party who gives knowing aid in some part of the criminal enterprise is a criminally responsible party under the Guidelines.'" (alteration in original) (quoting United States v. Hall, 101 F.3d 1174, 1178 (7th Cir. 1996))). Accordingly, because the record does not show that these individuals were participants or co-conspirators who the defendant "supervised [and who] were culpably involved in uncharged crimes 'that were part of the same course of conduct or common scheme or plan as the offense of conviction,'" Bapack, 129 F.3d at 1326 (citation omitted), the

government's reliance on these individuals as a basis for the enhancement is of no avail, see United States v. Singh, 195 F. Supp. 3d 25, 34–35 (D.D.C. 2016) (Walton, J.) (finding the aggravated role enhancement inapplicable because "nothing in the record before the Court suggest[ed] that [the defendant] exercised control over any co-conspirator subject to criminal liability").

The government also identifies the other smugglers who the defendant enlisted to assist in facilitating the unauthorized aliens' travel from Brazil to the United States. See Gov't's Mem. at 14. The government presented evidence that indicates that the defendant "coordinated [the unauthorized aliens'] travel arrangements and carefully orchestrated their movements throughout the various legs of the travel route onwards towards the United States." Id. As part of organizing these travel arrangements, the defendant provided the unauthorized aliens with instructions, including the contact information of other smugglers who would be assisting them at various points along their journey. The defendant would refer to the other smugglers as "his men" or "his guy." July 25, 2017 Trial Tr. 18:12–17; see also id. at 24:22–25:1. And, as part of the instructions, the unauthorized aliens and the other smugglers were directed to call the defendant if any problems arose during the journey to the United States. Id. at 24:15–21. In return for providing services to the defendant and assisting the unauthorized aliens, the defendant paid the other smugglers a portion of the fees paid by the unauthorized aliens. See id. at 32:10–16 (noting that the defendant often used Western Union to transfer the funds to the other smugglers). Based on this record, the Court finds that the defendant exercised sufficient control and authority over the other smugglers, who were clearly participants in the conspiracy.

Notwithstanding this evidence, the defendant relies heavily on the Circuit's holding in Quigley for his position that there must be some evidence of a hierarchically superior

relationship between him and his co-conspirators.  373 F.3d at 140; see also Def.'s Mem. at 8 ("The facts of this case suggest a horizontal—rather than hierarchical—business relationship between [the defendant] and his co-conspirators.").  However, in United States v. Brodie, the Circuit, without disturbing its holding in Quigley, distinguished the factual circumstances in Quigley, which this Court finds applicable in this case.  524 F.3d 259, 270–71 (D.C. Cir. 2008).  In Brodie, the Circuit noted that in Quigley, where the defendant "pleaded guilty to conspiracy to defraud the United States for her role in a house-flipping scheme," the defendant had "aided the scheme by helping her co-conspirators find appraisers to inflate the property values and by helping buyers obtain false income records so they would qualify for federally insured mortgages."  Id. at 270–71.  The Circuit further noted that the Quigley court determined "that a four-level 'organizer or leader' enhancement was not warranted because '[e]ntirely lacking on the record . . . is any evidence that [the defendant] had any sort of hierarchically superior relationship with the persons who were purportedly her subordinates."  Id. at 271 (first alteration in original) (quoting Quigley, 373 F.3d at 140).  But, the Circuit reasoned that "[w]hile [the defendant in] Quigley assisted others to engage in a fraud, [the defendant in] Brodie recruited and organized his coconspirators so that he could . . . retain the fruits of the fraud."  Id.  Thus, because the defendant in Brodie "occupied the top position in the conspiracy hierarchy, directing and supervising the efforts of [his co-conspirators]," the Circuit concluded that "the district court did not err in finding [him to be] an 'organizer or leader.'"  Id.; see also id. at 270 ("While plainly control is one factor in determining whether someone qualifies as an 'organizer or leader,' the Guidelines include several other factors," and the record "contains evidence supporting each of these factors.").

Similarly, in this case, the record contains evidence supporting each of the Guidelines

factors for consideration, leading the Court to conclude that the defendant "designed and led the conspiracy," id. at 271, and therefore was an "organizer or leader," U.S.S.G. § 3B1.1(a).[7] As the government notes, the evidence demonstrates that the defendant "was the Brazil-based regional leader and logistical mastermind of the smuggling conspiracy, responsible for organizing, coordinating and controlling a vast network of smugglers-level associates in service of the illicit movement of his clients towards and into the United States." Gov't's Mem. at 16. Through its investigation, the government learned that the defendant was "responsible for the illicit entry of more than [eighty] individuals who 'would not have made it to America' without him." Id. (citations omitted); see also July 25, 2017 Trial Tr. 35:20–25 (Stempinski testifying that the defendant was the largest smuggler of Pakistanis during the life of the conspiracy). As the mastermind, the defendant played a significant role in planning and organizing the unauthorized aliens' travel to the United States. He managed the safe house where they remained awaiting their travel, confiscated their travel documents, accepted payment for the smuggling fees, allocated the money to other co-conspirators, provided directions for the unauthorized aliens and co-conspirators to follow, and was the primary point of contact for any issues that arose throughout the unauthorized aliens' journey to the United States. In essence, the defendant, as a

---

[7] At the sentencing hearings, the defendant argued that the Court should not credit Stempinski's testimony because it was unreliable hearsay. See July 26, 2017 Trial Tr. 6–7 (noting that Stempinski was not present during the interviews conducted of the unauthorized aliens he testified about, and therefore he does not know if the wording used in the reports conveys the proper meaning of the language used by the unauthorized aliens). In determining whether a four-level aggravated role enhancement is warranted, the sentencing court may rely on hearsay. See United States v. Bras, 483 F.3d 103, 108–09 (D.C. Cir. 2007) (citing cases). As the defendant correctly notes, see July 26, 2017 Trial Tr. 6, the hearsay relied upon must have indicia of reliability, see id. at 109 ("[A]lthough the sentencing court may rely on evidence that would be inadmissible at trial, the evidence must nonetheless have 'sufficient indicia of reliability to support its probable accuracy.'" (quoting U.S.S.G. § 6A1.3)). Here, multiple unauthorized aliens identified the defendant as their smuggler, providing details regarding the instructions and contacts of other smugglers provided to them by the defendant. Additionally, the defendant "identified over a dozen individuals who . . . assisted him and his clients," Gov't's Mem. at 15, and he admitted to paying other smugglers for their services from the proceeds acquired from the unauthorized aliens, see July 25, 2017 Trial Tr. 32:24–33:8. Thus, because the record substantiates Stempinski's testimony, and because of Stempinski's considerable experience in these types of investigations, the Court finds that Stempinski's testimony has sufficient indicia of reliability, see id. at 8–12, and will therefore credit his testimony.

primary organizer and leader, exercised substantial decision making authority, recruited co-conspirators to assist in the conspiracy by either facilitating the unauthorized aliens' travel or securing additional clients, and controlled every aspect of the unauthorized aliens' journey from Brazil to the United States. Thus, like <u>Brodie</u>, the record supports a finding that the defendant was an organizer or leader of the conspiracy.[8]

### III. CONCLUSION

For the foregoing reasons, this Court finds that application of the four-level aggravated role enhancement set forth in Guideline 3B1.1(a) is appropriate in this case.

**SO ORDERED** this 5th day of September, 2017.

REGGIE B. WALTON
United States District Judge

---

[8] The defendant also argues that he "fear[ed] . . . certain other co-conspirators[, which] suggests that . . . others exercised control over him." Def.'s Mem. at 8; <u>see also</u> July 25, 2017 Trial Tr. 51 (noting that the defendant feared Abid Khan, a powerful and influential individual in Pakistan who can harm his family in Pakistan). The Court construes this argument as the defendant asserting that he was not the head organizer or leader of the conspiracy. The Court notes, however, that the record is unclear as to when this alleged fear arose. <u>See</u> Def.'s Mem., Exhibit ("Ex.") C (Letter from Sharafat Khan filed under seal) at 9. In any event, the Guidelines explicitly provides that "[t]here can . . . be more than one person who qualifies as a leader or organizer of a criminal . . . conspiracy." U.S.S.G. § 3B1.1 cmt. n.4.